## UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| **BENJAMÍN GONZÁLEZ MERCEDES**<br>**Plaintiff**<br><br>**v.**<br><br>**MIGUEL A. PEREIRA CASTILLO, et als.**<br>**Defendants** | **CIVIL NO. 11-1454 (CCC)** |

## OPPOSITION TO MOTION TO DISMISS

**TO THE HONORABLE COURT:**

COMES NOW the plaintiff Benjamín González Mercedes ("González") through the undersigned attorneys and respectfully State and Pray:

On October 13, 2011 co-defendants Maria E. Meléndez Rivera ("Meléndez"), Edwin Zayas Figueroa("Zayas"), Gloria E. Ortiz Martínez ("Ortiz") and Karla De Jesús Fuentes ("De Jesús"), filed <u>Motion to Dismiss</u> pursuant to Rule 12 (b) (6) of the Fed. R. of Civ. P.1

## I.    INTRODUCTION:

1.1    It is beyond question that the plaintiff has alleged sufficient facts to withstand dismissal on the pleadings. The plaintiff alleges viable causes of action and ample factual allegations demonstrating the plausibility of his claims under the *Iqbal* and *Twombly* standards against all defendants.2  The defendants*,* at "all

---

1    Codefendants Miguel A. Castillo-Pereira ( "Pereira") and Carlos Molina-Rodríguez ("Molina") have not appeared nor did they join the motion to dismiss.

2    ***Iqbal v. Ashcroft***, 556 U.S. 662, 129 S Ct. 1937 (2009); ***Bell Atlantic v. Twombly***, 550 U.S. 544 (2007).

times relevant to this complaint were acting under color of the law of the Commonwealth of Puerto Rico, and each of them is sued in her/his **personal capacity.**" Par. 17, Amended Complaint. Plaintiff's allegations are irrefutably sufficient to allow the trier of fact to conclude that the actions and omissions of these defendants caused the violations of clearly established constitutional rights.

1.2    The law in this case, was clearly Constitution of the Commonwealth of Puerto Rico and the seminal *Morales Feliciano* case, Civil No. 79-04 (PG), consolidated with the case of *Efraín Montero Torres, et als v. Rafael Hernández Colón, et als*, U.S. District Court for the District of Puerto Rico, Civil Num. 75-828 (*"Montero's Stipulations"*). Moreover, defendants' actions and omissions were in violation of Puerto Rico's Department of Corrections Parole Board's Rules (Decree# 6866 of August 25, 2004) and the **Montero's Stipulations.**   These mandates gave the defendants a very specific and well documented notification in order for them to understand that the lapses in the application of the due process rules posted a substantial risk of depriving inmates of their clearly established rights, and liberty interests; to be considered for parole at the minimum of their sentences despite the existence of a "detainer" for being a national of a foreign country without legal papers to live in the United States. See Parole Board Rules, Decree 6866, Rule 23.

1.3     On February 22, 2006, through "Motion For Remedies" based on the **Montero Stipulations,** Defendants Ortiz, Zayas, Meléndez, Rojas, and De Jesús, were delivered copy of the September 9, 2005 letter sent by González to Pereira. **Exhibits 3 and 4.** Each of these defendants knew or should have known of the violations of the plaintiff's civil rights due to her/his legal duties as a member of the DOC's Parole Board under the statutes of the Commonwealth of Puerto Rico, and the Parole Board Rules. Further, as members of the DOC's Parole Board and Pereira as the Administrator, each of these defendants had direct knowledge of the appeals proceedings brought by González since 2007, and each received notifications from the Legal Division of the Puerto Rico's Parole Board of the complaints brought by the plaintiff through the Department of Corrections ("DOC") administrative process. See **Exhibits 3 and 4**: Judgments of the Puerto Rico's Court of Appeals of September 28, 2007 and December 14, 2009. These judgments held, among others, that:

(a) The classification as an illegal immigrant subject to deportation constitutes a suspect classification (Judgment p. 7 –**Exhibit 3**), (b) parole is not a privilege, but a right, which although limited, must guarantee the due process of law ( Id.p.9-10); (c) the Parole Board, **in exercising its discretion, cannot disregard the law**. To that effect it must abide both the Constitutional mandate that no person in Puerto Rico will be denied equal protection of the law, and the Parole Board Rules and regulations: " **parole will not be denied to a prisoner**

**by the mere fact that he is subject to deportation.**" (Id. p.11); (d) the moral and social rehabilitation of the prisoners, within our constitutional framework, is of such urgency and hierarchy that it was expressly included in the Constitution ( id. p. 15); the purpose of parole is the prisoner's rehabilitation. Article 12.3 of the Parole Board Rules states that among the mandatory conditions exist the prerogative to authorize a "change of residence outside of Puerto Rico." (e) This could be easily carried out in his country of origin: Dominican Republic. (Id. p. 19-20), See, Art. 23 of the Parole Board Rules. (f) Section 3583 (d) of the Code of Criminal Proceedings in the federal jurisdiction contemplates the possibility that an inmate may serve his probational release in his country of origin. (Id. p. 21); (g) it would be fitting to grant González such benefit and surrender him to the federal authorities according to his detention order. See, United States v. Phommachanh, 91 F3d 1383, 1985. (Id, p 22). **Exhibit 3**, Court of Appeals Judgment of September 28, 2007, notified to Pereira and the Parole Board.

1.4    The Parole Board ignored the September 28, 2007 Judgment and the plaintiff filed a ***Mandamus*** before the Court of Appeals.   The Court issued the requested ***Mandamus*** ordering that: (1) save the existence of important matters which had not been previously considered, the Parole Board should accept the exit plan to the Dominican Republic presented by González; (2) he should receive the benefit of parole he requested, and; (3) González was to be surrendered to the United States Immigration and Naturalization Service. **Exhibit**

**4** (pp. 21-22) ***Mandamus*** Judgment entered on December 14, 2009, and notified to the Parole Board and Administrator Carlos Molina.

1.5     Finally, upon González pleadings, a writ ***habeas corpus*** was issued by the Court of Appeals emphasizing, among others, that:

(1) the Parole Board had not comply with its orders, and had in fact engaged in the same course of action that it (the Court of Appeals) had ruled unconstitutional; (2) the Parole Board, in denying González for the third time his right to parole, had interfered with his liberty interest requiring judicial intervention; (3) **that the Parole Board decision was arbitrary and contrary to the Court's mandates of September 28, 2007 and December 14, 2009**; (4) the Court granted the Parole Board, and its members, ten (10) days to surrender González to the United States Immigration and Naturalization Service for deportation. **Exhibit 5**, Court of Appeals ***Habeas Corpus*** Judgment of May 10, 2010, notified to the Parole Board and Administrator Carlos Molina.   Defendants cannot argue that in González's case they had "discretion" in the granting of parole process or that they acted in "good faith".

1.6     The Parole Board Members not only openly disregarded the Judgment of the Court of Appeals in the Administrative Revision procedures but disobeyed the Court of Appeals ***Mandamus*** Judgment of 2009 as well. Defendants cannot argue that in González's case they had "discretion" in the granting of parole process or that they acted in "good faith".   As officials of the

Executive Branch of Government, the parole board members had a **_ministerial_**

**_duty_** which they did not execute notwithstanding the previous rulings of the Court

of Appeals.   "**Absolute immunity, … is 'strong medicine, justified only when**

**the danger of [officials' being] deflect[ed from the effective performance of**

**their duties] is very great.**'" (Citations omitted) **_Forester v. White_**, 484 U.S. 219

(1988).

## II.    FACTUAL BACKGROUND:

2.1    Benjamín González Mercedes was born in the Dominican Republic.

He was released from prison at the age of 32 years old, after 16 years as an

inmate of the Commonwealth of Puerto Rico's DOC.

2.2    When he was 16 years old, he was arrested by the Puerto Rico

police on September 14, 1994, and convicted to 40 years in prison after plea

bargaining was entered on December 2, 1994, under charges of robbery and

illegal possession of firearms.   González was treated as an adult.

2.3    The DOC determined that based on the sentence González would

complete minimal imprisonment on **February 25, 2004.** At that date the plaintiff

had also completed several institutional treatments and social rehabilitation

programs.

2.4    Since completing minimal imprisonment, the plaintiff was negligently

and unlawfully imprisoned and confined in the correctional system of Puerto Rico

in excess of six (6) years, without being considered for Parole until 2007, in

violation of the *Stipulations* reached in **Efraín Montero Torres, et als v. Rafael Hernández Colón, et als,** supra, and the Parole Board's Rules (Decree # 6866 of August 25, 2004), as well as the Judgments issued by the Commonwealth of Puerto Rico's Court of Appeals in 2007, 2009 and 2010, declaring unconstitutional the treatment received by the plaintiff in the Parole Board's Resolutions.   **Exhibit 5**, p. 22.

2.5    During the time González was imprisoned, he received several trainings and educational instructions, including theatrical skills.   However, due to defendants' fault and reckless disregard of the plaintiff's rights, the DOC did not grant him the educational diploma due to his status as an illegal alien.   His evaluations and progress reports were excellent.   This aspect was stressed in the May 10, 2010 ***habeas corpus*** judgment of the Court of Appeals of Puerto Rico, ***Benjamín González Mercedes v. Junta de Libertad Bajo Palabra, et als***, Civil No.   (KLRX201000074).   **Exhibit 5,** pp. 30-33.

2.6    Inapposite to applicable regulations, the defendants, for purposes of parole did not consider González's achievements during his incarceration.   If considered, it would have made him eligible for parole since at least February 25, 2004.   **Exhibit 5**, p. 31:

2.7    In multiple occasions during his unlawful imprisonment González was submitted to drugs and alcohol tests and the result of these were negative. **Exhibit 5**, p. 31.

2.8     Psychological evaluations of the plaintiff, recommended that he be granted any privilege due. (See, **Exhibit 5**, *Habeas Corpus*, pp. 30-33).

2.9     After having served the minimal sentence, the plaintiff was not the subject of complaint or disciplinary proceeding, and since February 2002 he was reclassified to minimal custody status, condition which he maintained until released from prison in 2010.

2.10    According to the information compiled by the DOC in the administrative records under the custody of the Parole Board, González was recommended for release by socio-penal technicians and staff supervisors. (**Exhibit 5**, *Habeas Corpus*, pp. 30-33).   Among González's achievements while imprisoned are the following: he completed the course "living without violence", being awarded 75 points by  the DOC's Treatment and Rehabilitation Bureau which reflects a high degree of progress (Certification March 30, 2009); he finished studies under Law 188; worked as a janitor; Certification for perfect assistance to school, May 3, 2000; Barber Course Certification, June 23, 2000; Award of the Educational Area, Effective Communication, September 17, 1998; Award of the Educational Area, Sexual Abuse, October 22, 1998; Award of the Educational Area, Legal and Illegal Drugs, October 22, 1998; Award of the Educational Area, Tools, Equipment and Electricity, May 11, 1999; Award of the Educational Area, History of the Profession, May 11, 1999; Award of the Educational Area, Sexually Transmissible Diseases, March 4, 1999; Award of the

Educational Area, Employment, June 14, 1999; Award of the Educational Area, Personality Development, April 29, 1999; Award of the Educational Area, Pericranium Treatment, May 11 1999; Certification from the Treatment Program Against Addiction, October 12, 2001 (González was never a drug's user); Certification of group therapy regarding violence, reflection and control, (June 19, 2003 – October 2, 2003).

2.11   Upon complying with the minimum imprisonment requirement of his sentence, during the next six (6) years of incarceration, González was evaluated several times by the Corrections' Parole Board, without obtaining the release from imprisonment to which he had a right after rehabilitation and excellent adjustments.

2.12   On **June 1, 2010,** after several administrative and judicial incidents, i.e. *Administrative Revision (2007)*, **Mandamus** (2009) and **Habeas Corpus** (2010) proceedings before the Commonwealth of Puerto Rico's Court of Appeals, González was released from prison.   **Exhibits 3, 4, 5**.

2.13 The Corrections' Parole Board, composed by Ortiz, Zayas, Meléndez, Rojas, and De Jesús,   scheduled review and hearing of the plaintiff's case for the first time in November 2005. The belated hearing was in violation of the due process of law, the Parole Board's Rules and the **Montero Stipulations**, according to which the hearing should have been scheduled at least 45 days after February 25, 2004, date of the minimum sentence served by the plaintiff.

Moreover, contrary to the Parole Board's Rules and the *Montero's Stipulations,* the hearing scheduled for November 2005 was postponed because of lack of notification to the plaintiff's legal counsel. "Commencing twelve months from the effective date of this Stipulation, the Parole Boars **shall** hear and consider each felon's case within forty-five (45) days from the date of the expiration of said felon's minimum sentence." **Exhibit 6**, Stipulation # 8:

2.14   Through letter sent on September 9, 2005, by González to Pereira, the Secretary of the DOC received notice of the plaintiff having completed time in excess of the required by sentence and his complain of the illegal conditions to which he was being subjected to as he was being denied rehabilitations programs due to his nationality, disregarding his good conduct and work experience during his imprisonment. González never received an answer to his letter. This letter was also notified to the defendants, members of the Parole Board. **Exhibit 2,** Letter to Pereira**.**

2.15   The initial hearing to consider González's request for parole was belatedly re-scheduled for April 2006, also in violation to the due process of law, the ***Montero Stipulations*** and the Parole Board's Rules, which determine that once the plaintiff completed his minimum sentence (February 25, 2004) the Parole Board had 45 days to hold parole hearing and 50 days to notify its decision. Stipulations 8 and 10, **Exhibit 6**.

2.16   The first Parole Board's Resolution denying parole to González was

issued on April 2007, and notified to Plaintiff on May 2007, exceeding by far the hearing and notice requirements of the Parole Board's Rules and the **Montero Stipulation 10**, **Exhibit 6**.   According to the law and the Parole Board regulations, the initial hearing had to be held within the next 45 days following the date of the minimum sentence on February 2004.   After the initial hearing the Parole Board has 30 days to issue a Resolution and 20 days to notify the Resolution to the petitioner, for a total of 50 days.

2.17   Defendants Ortiz, Zayas, Meléndez, Rojas, and De Jesús, members of the Parole Board based their Resolutions in the existence of a "detainer" issued by the U.S. Immigration and Naturalization Department, and the lack of a Reciprocity Agreement or compact between the Commonwealth of Puerto Rico and the Dominican Republic that would allow the Parole Board to supervise González after his deportation to the Dominican Republic.

2.18   This practice was held unconstitutional by the Commonwealth of Puerto Rico's Court of Appeals in the   judgment entered on September 28, 2007, in the case **Benjamín González Mercedes v. Junta de Libertad Bajo Palabra, et als,** Civil No. KLRA 20070058. **Exhibit 3**. The Court of Appeals overruled the Parole Board Resolution, holding that the Board was not complying with its own rules, and ordered the Parole Board to continue evaluating the plaintiff's case as part of its obligation to the principle of rehabilitation.

2.19   Specifically, the Court of Appeals ordered the Administration of

Corrections and the Parole Board to assist González in order to elaborate a release plan for the Dominican Republic and to surrender Mr. González to the Federal authorities for his deportation.

2.20   Notwithstanding the Court of Appeals rulings, the Parole Board, and the DOC under both Pereira and Molina, retained González under custody in violation of the established law, and disregarding several motions filed by González before the Court of Appeals and the Parole Board requesting enforcement of the September 29, 2007 judgment. **Exhibit 3**.

2.21   Defendants Ortiz, Zayas, Meléndez, Rojas, and De Jesús, with Molina's knowledge and approval, in violation of the September 28, 2007 judgment, entered a second Resolution by the Parole Board on March 2, 2009 denying parole to González.   After several legal proceedings before the Parole Board and the Court of First Instance of Puerto Rico, Bayamón Part, the plaintiff brought his pleadings again before Puerto Rico's Court of Appeals. The appellate court, in ***Benjamín González Mercedes v. Junta de Libertad Bajo Palabra, et als,*** Civil No. KLRX200900074, on December 14, 2009 issued ***Mandamus (Exhibit 4)***, ordering the Parole Board to follow the directives contained in the September 28, 2007 judgment, which was final and the Law of the Case. This time the Puerto Rico's Court of Appeals ordered the Parole Board that in the absence of extraordinary circumstances, they had to heed the previous judgment and tender González to the U.S. Immigration authorities for his deportation to the

Dominican Republic.

2.22   Defendants Ortiz, Zayas, Meléndez, Rojas, and De Jesús, with Molina's knowledge and approval, defied the judgment of the Court of Appeals, and through Resolution again denied parole to González, raising the same arguments of its previous resolutions.

2.23   Due to the arbitrary and improper resolutions of the Parole Board, González sought review of this last disposition through **Habeas Corpus** proceedings before the Court of Appeals. **Exhibit 5**.   After hearing held on March 12, 2010, the Court of Appeals issued **habeas corpus** on May 20, 2010, ordering the DOC and the Parole Board to grant parole to González and to surrender him to the U.S. Immigration authorities for his deportation to the Dominican Republic. **Exhibit 5**.

2.24   Contrary to clearly established law and Parole Board Rules, González was unlawfully incarcerated at least since April 2004, in spite of several motions filed before the Parole Board and three different procedures before the Court of Appeals.

2.25   Since September 9, 2005, Defendant Pereira was notified of the ordeal faced by González, and upon assuming the position of Secretary and Administrator of the DOC, so was Molina. **Exhibit 2**.   The plaintiff ordeal is exemplified as follows:

a.     On February 23, 2006 González filed a "Petition for Remedies"

before the Parole Board to request the application of the **_Montero Stipulations_**
and the Parole Board's Rules in compliance with the due process of law.   No
response from the Parole Board was received;

b.      On February 20, 2007 González filed another "Petition for Remedies"
to request the compliance with the due process of law. In this occasion he
requested that his case be consulted with the Secretary of the DOC, defendant
Pereira.   Nothing was done;

c.      On October 24, 2007, after the Court of Appeals Judgment of
September 28, 2007, González requested before the Parole Board to hold a
hearing and to order the DOC to organize with the Plaintiff his "release plan" to the
Dominican Republic, notwithstanding the lack of a "reciprocity agreement" with
the Dominican Republic.   Nothing was done by the Parole Board and González
sent a letter to the social worker assigned to his case, Juan Carlos Santana
-**Exhibit 7**;

d.      Defendants' inaction notwithstanding, González organized his
"release plan" for the Dominican Republic with the assistance of his legal counsel
and notified the plan to both the Parole Board and the Court of Appeals through
Informative Motion dated January 22, 2009. **Exhibit 8**, On March 2, 2009, the
Parole Board denied the Plaintiff's release plan;

e.      González filed a Motion for Reconsideration on March 18, 2009
before the Parole Board -**Exhibit 9**, and insisted that the board was in violation of

its own Rules and Procedures, the ***Montero Stipulations*** and the Court of Appeals' Judgment of September 28, 2007.   Once again, nothing was done by the Parole Board;

f.     Another Motion was filed before the Parole Board in May 12, 2009 requesting to act in accordance with the Judgment of September 28, 2007;

g.     After a ***Mandamus*** was issued by the Court of Appeals on December 14, 2009, González once again filed a Motion before the Parole Board claiming for his rights to be released from prison;

h.     On **June 1, 2010,** after ***Habeas Corpus*** (2010) proceeding before the Commonwealth of Puerto Rico's Court of Appeals, González Mercedes was released from prison and deported to the Dominican Republic.

2.26   In the year 1996, the U.S. District Court for the District of Puerto Rico entered an Order Directing partial Judgment in favor of plaintiffs in ***Morales Feliciano v. Rosselló González,*** Civil No. 79-4. The ***Montero Case*** was consolidated with ***Morales Feliciano,*** supra. The defendants in the instant case knew that non compliance with the ***Montero Stipulations***, the laws and regulations of the agency would infringe González's rights. ***Farmer v. Brennan,*** 511 U.S. 825, 834; 842-843 (1997).

2.27   In ***Morales Feliciano v. Rosselló Gonzalez***, Civil No. 79-4, supra, on January 25, 2000, the Court entered Opinion an Order (docket entry #7478), which in its pertinent part reads as follows: "…*the inability to pay close attention*

**15**

*and collect adequate information for classification purposes hinders an inmate's ability to qualify for downward modifications in their custody levels, which in turns makes it harder for them to obtain early release programs.* **_Pursuant to Commonwealth law, the Administrator is required to conduct periodic evaluations of all inmates for the purpose of classifying them and determining a plan of individualized treatment for each inmate._** *Law No. 116 of July 22, 1974, PR Laws Ann. Titl.4 sec 1121."* **Morales Feliciano,** Opinion an Order (docket entry #7478), p.110-111 (emphasis provided).   It is evident that the Administrators in this case failed with their obligations towards González.

2.28   Defendants Pereira and Molina, failed to assure adequate training, supervision, monitoring, disciplining, evaluating, and/or disciplining, the members of the Parole Board , which caused the plaintiff to be unlawfully incarcerated beyond the term of the minimum of his sentence without being considered for parole.

2.29 Defendants Ortiz, Zayas, Meléndez, Rojas, and De Jesús, failed to assure, adequate training and supervising any and all personnel under their charge, as well as through their direct participation in denying parole to a national of the Dominican Republic who lacked legal documents to remain within U.S. territory, caused profound continuous and successive damages to the plaintiff in violation to several judgments of Puerto Rico's Court of Appeals, the ***Montero Stipulations*** and the Parole Board's Rules and Procedures.

2.30   Defendants Pereira, Molina, Ortiz, Zayas, Meléndez, Rojas, and De Jesús, knew or should have known that the practice in other jurisdictions within the United States is to grant parole and render the illegal alien to the U.S. Immigration and Naturalization authorities in order to be deported to his country of origin.   Once it is done, the supervision of the parolee becomes meaningless. See **Exhibit 5**, p. 10.

## III.   STANDARD FOR A MOTION TO DISMISS:

3.1   On a motion to dismiss a "court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegation." ***Swierkiewicz v. Sorema N.A***., 534 U.S. 506, 512 (2002). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" ***Iqbal v. Ashcroft***, 129 S.Ct. 1937, 1949 (2009), quoting ***Bell Atl. Corp. v. Twombly***, 550 U.S. 544, 570 (2007);   "….we do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.") ***Ocasio-Hernández v. Fortuño-Burset***, (1st Cir. slip opinion, April 1, 2011, p. 12) (Citing ***Twombly***). "Courts may augment the facts in the complaint by reference to (i) documents annexed to the complaint or fairly incorporated into it, and (ii) matter susceptible to judicial notice."   Opinion and order, pages 7-8, citing ***Gagliardi v. Sullivan***, 513 F. 3d 301, 306 (1st Cir. 2008), Addendum.  Moreover, the district court can also consider "documents

incorporated by reference in the complaint, matters of public record, and other matters susceptible to judicial notice." *Giragosian v. Ryan*, 547 F3d 59, 65 (1st Cir. 2008).

**A.    The constitutional question at issue**:

3.2    The motion to dismiss does not mention at all the first cause of action raised in the Complaint: "A. Cruel and unusual punishment, unlawful imprisonment, and denial of due process."    Under this cause of action it is alleged, inter alia, that "each defendant during the time he/she held supervisory position at the Corrections Department and the Parole Board, were acting under color of the laws of the Commonwealth of Puerto Rico." Further, "In keeping the plaintiff confined beyond the term of the minimum of his sentence, each defendant acted with deliberate indifference and/or reckless disregard of the plaintiff's Eight Amendment rights and due process of law." Moreover, each defendant, acting under color of the laws of the Commonwealth of Puerto Rico, without due process, unjustifiable deprived the plaintiff of liberty causing him profound continuous and successive damages."

3.3    "The Eighth Amendment provides: 'Excessive bail shall not be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted.' The Eighth Amendment is applicable to the states through the Fourteenth Amendment." *Feliciano v. Barceló*, 497 F. Supp. 14, 33 (D. Puerto Rico 1979); citations omitted. "Puerto Rico occupies a unique position with relations to the

United States and the Supreme Court has never resolved whether the inhabitants of Puerto Rico are protected by the Bill of Rights or by the provisions of the Fourteenth Amendment." Id. Citations omitted. "The Eighth Amendment proscribes more than physically barbarous punishment." Id. Citations omitted. "Embodied within the Eighth Amendment are broad and idealistic concepts of dignity, civilized standards, humanity and decency …" Id. Citations omitted. Further, in the seminal case, in analyzing the relationship of the Commonwealth of Puerto Rico and the United States, this Court concluded: "Nevertheless, the Supreme Court has categorically stated that regardless of whether the rights of its inhabitants are afforded protection under the Eighth Amendment or Fourteenth Amendment, such protection is available through suits filed pursuant to 42 U.S.C. sec 1983, and jurisdiction lies under 28 U.S.C. sec. 1343." Id. Citations omitted.

3.4     On a case on all fours, the Third Circuit examined the liability of prison officials under Section 1983 and the Constitution when a prisoner is held in jail beyond the term of sentence: "Before discussing these factual issues, however, we must examine the legal issue of whether, if there was a deprivation, it was of a right secured by the Constitution, in this case by the "cruel and unusual punishment" clause of the eighth amendment.   *Sample v. Diecks*, 885 F. 2d 1099, 1107 (3rd Cir. 1989).   "Whether Samples detention beyond the expiration of his term violated the eighth amendment requires us to consider whether that detention was "punishment" and, if so, whether it was "cruel and unusual".   We

concluded that it was both. Id, at 107-08.   "We think there can be no doubt that imprisonment beyond one's term constitute punishment within the meaning of the eighth amendment." Citations omitted.   "**Indeed, confinement in a prison pursuant to a conviction seems to us to be quintessentially punitive**.   Here for example, the state, through its official agents, intended to confine , did confine, and intended to continue to punish Sample throughout his confinement, including the unwarranted portion of it." (Emphasis added).   Id. At 1108.

3.5   "We now examine whether Sample's detention beyond term was "cruel and unusual." Today the Eighth Amendment prohibits punishment which, although not physically barbarous, involves the "unnecessary and wanton infliction of pain."   Citations omitted.   "One class of 'unnecessary and wanton wrongs', and the one most relevant here, is those wrongs without penological justifications." Citations omitted.   "In this sense, his continued incarceration was not penologically justified." Id. At 1108.

3.6   Thus, the constitutional issue in this case is whether the plaintiff's incarceration after he had exceeded the minimum of his sentence and qualified for parole, as stated by the Court of Appeals, violates the Eighth and Fourteenth Amendments, and whether the conduct of the defendants infringed the Due Process Clause of the Fifth and/or Fourteenth Amendments, the Regulations of the Parole Board, and the Montero Stipulations, inflicting cruel and unusual punishment in contravention of the Eighth Amendment.

3.7    Having clarified for the defendants the nature of the claims against them, we shall proceed to discuss their arguments as presented in the Motion to Dismiss.    However, because the complaint was not filed against the Parole Board members in their official capacities, we will not discuss the immunity defense raised by the defendants under the Eleventh Amendment.    That is not an issue in the instant case.

## IV.    CLAIM UNDER 42 U.S.C. sec. 1983:

## A.    Due process of law violation:

4.1    The alternative of parole, considered by the government as a privilege, yet has a strong and pragmatic impact in the freedom of a human being. Freedom inherent to the rehabilitation process which since the eighteenth century started becoming the main concern of the criminal system rather than punishment. (See Neil P. Cohen, *The Law of Probation and Parole*, 2nd Ed. Part 1, West Group, pag. 1-7 (1999).)   A liberty interest protected by the United States Constitution that no one could deny.

4.2    According to the United States Supreme Court in *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed. 2d 451 (1976), liberty or property interests could be created not only by statutes, but also by rules and regulations, by state and federal constitutions, and even possibly by justified expectations induced by accepted practices.   Regarding this last assertion see *Perry v. Sindermann*, 408 U.S. 593, 601, 92 S. Ct. 2694, 33 L. Ed. 2d 570 (1972) as cited by Neil P.

Cohen, supra, at 6-7.

4.3    If a liberty interest is established, the due process clause establishes minimum procedural guaranties which must be accorded by the jurisdiction. Id. In Puerto Rico, this due process of law was established not only in the Rules of the Parole Board, but also in the *Stipulations* reached in the *Montero Case*, where a "**right to redress**" is established if a violation of due process is committed.   See **Exhibit 6,** Stipulations 8 and 12.

4.4    For state cases holding that a liberty interest has been created, see *Trantino v. New Jersey State Parole Board*, 154 N.J. 19, 711 A.2d 260 (1998) (liberty interest created by New Jersey parole statutes); *Harwood v. Johnson*, 326 N.C. 231, 388 S.E.2d 439 (1990) (North Carolina parole statute created liberty interest since statute creates a presumption that parole release will be granted if there are no findings that fall within stated exceptions); *State v. Tillinghast*, 609 A.2d 217 (R.I. 1992) (Rhode Island parole statutes created liberty interests). Cf. *Matter of Powell*, 101 Wash.2d 175, 814 P.2d 635 (1991) (setting preliminary release date creates liberty interest). Neil P. Cohen, supra, at 6-11 to 6-12, footnote 14.

4.5    On the other hand, there are certain federal cases holding as well that a liberty interest has been created: *Board of Pardons v. Allen*, 482 U.S. 369, 107 S.Ct. 2415, 96 L.Ed 303 (1987) (Montana parole statute creates liberty interest because it requires release on parole once certain findings are made);

***Neal v. Shimoda***, 131 F.3d 818 (9th Cir. 1997) (Hawaii's sex offender parole law requiring successful completion of treatment program and confession to past sex offenses as precondition for parole eligibility created liberty interest); ***Felce v. Fiedler***, 974 F.2d 1484 (7th Cir. 1992) (Wisconsin's mandatory release statute creates liberty interest in parole); ***O'Bar v. Pinion***, 953 F.2d 74 (4th Cir. 1991) (state-given right to mandatory parole creates liberty interest); ***Bermudez v. Duenas***, 936 F.2d 1064, 19 Fed. R. Serv. 3d (LCP) 1443 (9th Cir. 1991) (Guam statute created liberty interest in parole if prisoner met certain conditions); ***Watson v. DiSabato***, 933 F.Supp. 390 (D.N.J. 1996) (New Jersey parole statute created liberty interest); ***Clarkson v. Coughlin***, 898 F. Supp. 1019, 10 A.D.D. 642 (S.D.N.Y. 1995) (New York parole statute created limited liberty interest.) Id.

4.6    As it is the case in Puerto Rico, "[t]he most compelling source [of a liberty interest] is a state or federal statute creating an entitlement to release on parole.   **Another possible source is a parole authority's administrative regulations issued pursuant to statutory delegation**." Emphasis added. Id., at 6-15.   Due process procedures are mandated for parole granting if a liberty interest is involved.   Therefore, these administrative rules may be specific, limit the agency's discretion and make parole a certainty in certain circumstances. Id. All these characteristics can be found in the Puerto Rico's DOC Parole Board Rules and the ***Montero Stipulations***.

4.7    In ***Payton v. U.S.***, 636 F. 2d 132, 135-136 (1981), a case under the

Federal Tort Claims Act (FTCA), the Court ruled that members of the United States Board of Parole were not exempt from suit under section 2680 (a) as "discretionary function".   "The complaint avers that the negligent reduction of Whisenhant 's sentence by appellee, United States Parole Board, and the subsequent negligent decision to release and parole Whisenhant by the Board, due to the Board's failure to acquire and read the records indicating his murderous propensities, proximately caused Mrs. Payton's death and appellants' injuries."   It is clear that federal parole officers are subject to liability under the FTCA as long as their acts are considered out of the scope of their "discretionary function".   Although there is no case law considering a factual situation similar to the captioned case, this Court may consider that as long as parole officers or members of a parole board's actions fall out of their "discretionary functions" and jeopardize the constitutional and civil rights of a person, absolute immunity shall not be raised as a shield against actions under 42 U.S.C. sec. 1983.

V.   **LACK OF IMMUNITY:**

5.1   It has been widely recognized that "governmental officials who administer the parole system are expected to abide by precepts of fundamental fairness in reaching their decisions." See **Labbe v. Russi**, 158 Misc. 2d 532, 601 N.Y.S. 2d 643 (Sup. Ct. 1993) as cited by Neil P. Cohen, **The Law of Probation and Parole**, 2nd Ed. Part 1, West Group, p. 4-10 (1999).

5.2    As a general rule, the parole board, as a state agency, cannot be held liable for damages, unless the state has waived immunity. Id., Part 2, at 29-49; 29-50.   But even if the Board is immune regarding release decisions, which are quasi-judicial in nature, parole board members may be sued in their individual capacities. Id.   As part of the executive branch of government, some courts have held that they are under the scope of some kind of qualified immunity from damage awards.   Other jurisdictions recognizes absolute immunity if the parole members have acted in good faith and within the scope of their discretion. In **Scheuer v. Rhodes**, 416 U.S. 232, 247-48, 94 S.Ct. 1683, 40 L.Ed. 2d 90 (1974) the U.S. Supreme Court stated:

> " [I]n varying scope, a qualified immunity is available to officers of the executive branch of government, the variation being dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based.  It is the existence of reasonable grounds for the believe formed at the time and in light of all circumstances, coupled with good-faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct."

Id., at 29-50; 29-51.

5.3    While some courts have granted "qualified immunity" to parole board members, other courts have found that parole board members enjoy "absolute immunity" from damage suits at least in some circumstances as for example in granting, denying or revoking parole. See **Hulsey v. Owens**, 63 F.3d 354 (5th Cir. 1995) (noting that most circuits hold that parole board members have absolute immunity from suits based on their decisions to grant, deny or revoke parole, **but**

**are entitled only to qualified immunity for administrative functions**). (Emphasis added) as cited in Id., at 29-51.   See also ***Wilson v. Rackmill***, 878 F.2d 772 (3rd Cir. 1989) (federal parole examiners have absolute immunity for adjudicatory functions **and qualified immunity for executive and investigative functions**). Emphasis added.

5.4    In Puerto Rico, the government has recognized the liability of the Parole Board and its members by consenting to the **Montero Stipulations** which creates a "right to seek redress from this Court pursuant to paragraph 12 of this Stipulation" if the Parole Board does not hold a hearing within the times specified in its own regulations. See **Exhibit 6,** Stipulation # 8**.**   It is evident, according to these Stipulations, that the Government of Puerto Rico waived its immunity from damages suits regarding the Parole Board and its members.   Stipulation # 12 reads as follows:   "Any judgment entered hereon shall be subject to the continuing jurisdiction of the United States District Court for the District of Puerto Rico for enforcement."   According to these stipulations the Government of Puerto Rico has been compensating inmates for violations to the due process of law whilst not complying with the holdings of hearings within the times specified in the ***Stipulations***.   See ***Stipulation*** and compensation agreement reached on October 30, 2009. **Exhibit 10**.

5.5    Moreover, in the instant case, the Parole Board and its members failed not only in their evaluation of Mr. González petition for parole, but also they

failed in their administrative and investigative functions while not attempting to reach a "reciprocity compact" or agreement with the Dominican Republic in order to be able to supervise upon release all Dominican citizens who qualified for parole, instead of keeping them in prison for the whole term of their sentences. There is no information in the record regarding the efforts made by the DOC, the Parole Board or the Government of Puerto Rico in order to reach such an agreement.   Indeed, there are many other Dominican citizens who at the present are doing their sentences in Puerto Rico without the right to parole due to the negative of the authorities to implement the judgments reached by the Puerto Rico's Court of Appeals in the case of Mr. González Mercedes since 2007 until 2010. See 4 L.P.R.A. sec. 1433 et seq. Although a <u>Memorandum of Understanding</u> was signed regarding non violent offenders on July 31, 2008, nothing was done regarding other felonies. **Exhibit 11**.

5.6    In addition, the Parole Board members had an obligation to investigate and to assist the Plaintiff in his efforts to arrange a "release plan" for the Dominican Republic which includes housing, work and a counselor among other factors.   It was so ordered since the September 28, 2007 Court of Appeals' Judgment. The defendants members of the Parole Board nor the defendants Administrators or Secretaries of the DOC obeyed this order. It was the plaintiff himself, with the assistance of his lawyer who prepared the "release plan" and submitted it to the Parole Board in order to exercise some pressure on the Parole

Board to comply with the Court of Appeals' judgments, including the **_Mandamus_**
Judgment of December 2009. That never happened. On May 20, 2010, the Court
of Appeals stated in the **_habeas corpus_** that the insufficient information in the
files did not allow it to conclude that the Parole Board or the Correction
Administration were adequately assisting the plaintiff in elaborating a viable exit
plan from Puerto Rico due to his condition as an in-documented prisoner. This is
in itself a serious violation of the investigative and administrative duties imposed
by the Court in order to speed Gonzalez's release from prison.   In the case at bar
the Parole Board Members' failed in their **administrative** and **investigative**
duties while not ordering the AOC to prepare the release plan for Mr. González in
compliance with the September 28, 2007 Judgment issued by the Court of
Appeals.   See 4 L.P.R.A. sec. 1506:

> "The Board members and the Examiners designated by the Board
> are empowered: (a) To issue summons for the presence of witnesses and
> the production of … documents … pertinent to investigations carried out in
> the performance of their official duties. …
> …
> If a summons issued by any member of the Board or the examiners
> designated thereby is not duly obeyed, the board may appear before any
> part of the Court of First Instance of Puerto Rico to request the Court to
> order compliance of the summons. …
> …
> It may also punish the disobedience of any order thus issued, for
> contempt."

Although the release plan was organized by the plaintiff himself, with the
assistance of his lawyer and his family in the Dominican Republic, the Parole
Board simply ignored the Court of Appeal's Judgment (2007) and Mandamus

(2009) as well as its administrative and investigative powers in order to empower the Judgments issued in this case.

5.7    And this bring before the attention of this Court a third issue regarding "check and balances" that militates against the doctrine of absolute immunity of the parole board members as quasi-judicial officers in this specific circumstances, which have been distinguished from previous cases.   Although there is an analogy between the adjudicating functions of the parole board members and the function of judges, the reality is that parole board members are still part of the executive branch.   For that reason an appeal process has been recognized in the jurisdiction of Puerto Rico to review parole decisions. Therefore, once their decisions are taken for review before a court of appeals, moreover, when a judgment of **Mandamus** had been reached, the parole board members have no discretion but a duty to comply with the court's order as part of the executive branch.   That is the inherent power of judicial review which is the cornerstone of our constitutional system, based in what has been called "check and balances".   Otherwise, this would create a serious conflict between the constitutional branches and the republic form of government designed by the founding fathers of the United States Constitution. For a discussion of the separation of powers issue see **Payton v. U.S.**, 636 F.2d 132 (1981).   See also Neil P. Cohen, **The Law of Probation and Parole**, 2nd Ed. Part 2, West Group, at p. 29-27 (1999): "Parole is an administrative process and the availability of a

judicial appeal varies considerably, depending on the jurisdiction's view of separation of powers."   In the case of Mr. González the Court of Appeals review his case as an administrative review (2007), a mandamus (2009) and a habeas corpus (2010).   It is crystal clear that the Judgments of the Court of Appeals were directed to the Parole Board and the AOC as part of the Executive Branch in order to comply with their ministerial duties in the investigative and administrative functions of the agency.   In this respect, this Court has to point out the differences between adjudicatory and administrative acts of the parole board members in the context of this case.   See **Thompson v. Burke**, 556 F. 2d 231 (1977) (The work of a Pennsylvania State Parole Board member certainly includes facets of quasi-judicial duties in affecting the length of sentences, nonetheless they are not judicial officers. **They are in reality executive officers carrying out the policy of the State in respect to probation and parole**).

5.8    In the case at bar, the members of the Parole Board refused to follow the orders of the Court of Appeals at least in two occasions. Even if we could buy the theory that the first resolution of the Board was covered by some kind of immunity, that definitely cannot be the case regarding the second and the third resolutions denying parole in open violation to judicial orders. There is no discretion at all for the for the members of the Parole Board to decide if its members would comply or not with a court order. The resolutions of the Parole Board denying parole and refusing to surrender the Plaintiff to the federal

authorities for deportation notwithstanding the judgments of the Court of Appeals of September 28, 2007 and December 14, 2009 are capricious and arbitrary actions that shall not be covered by any sort of immunity, neither absolute nor qualified immunity.   To hold that the Parole Members are still covered by immunity from damage suits, should not be sanctioned by this court.   See **Thompson v. Burke**, 556 F. 2d 231, 237 (1977) (The purpose of the Court of Appeals' focus upon the functional nature of the activities rather than respondent's status was to distinguish and leave standing those cases, in its Circuit and in some others, which hold that a prosecutor engaged in certain investigative activities enjoys not the absolute immunity associated with the judicial process, but only a good-faith defense ...). See also **Forrester v. White**, supra, p. 225, regarding the functional approach (this Court has been quite sparing in its recognition of claims to absolute official immunity …[T]he Court has been careful not to extend the scope of the protection further than its purposes require.)

5.9    "The crux of the concept embodied in the discretionary function exemption is that of the separation of powers." **Payton v. U.S.**, 636 F.2d 132, 144 (1981).

5.10   "[S]eeking relief for the failure to proceed in accordance with the agency's own regulations does not appear to raise significant separation of powers problems so as to preclude the action under the discretionary function

exemption.   See *United Airlines, Inc. v. Wiener*, 355 F. 2d 379, 394 (6th Cir. 1974)." *Payton*, supra, p. 147.

5.11   In this case, the pleadings stated that "the Board simply disregarded the psychiatric evaluations of Whisenhat as a homicidal psychotic likely to repeat his brutal behavior.   This allegation implicates the decisionmaking process most directly and therefore raises separation of powers issues.   The government has taken the position that even if the Board knew Wisenhant would go on such a hideus rampage as occurred it still has the discretion to release him and remain protected from liability under section 2680(a).   This cannot be true." *Payton*, supra, p. 147. For the same reason it cannot be true that the Parole Board members in this case can be protected from liability when they were openly violating the Judgments of the Court of Appeals jeopardizing the constitutional rights and the liberty interests of the plaintiff to a due process of law. See also *Hatahley v. United States*, 351 U.S. 173, 76 S. Ct. 745, 100 L.Ed. 1065 (1956), as cited in *Payton*, supra, p. 147.

5.12   "In *Underwood v. United States*, 356 F. 2d 92 (5th Cir. 1966) this Court determined that the negligent discharge without restrictions, of a mental patient made without adequate consideration of the patient's history by the releasing psychiatrists, was actionable and not protected by section 2680(a)." *Payton*, supra, p. 148.

5.13   "[T]he only issue before the Court in trying such actions would be the reasonableness of the injurious activity, not whether the best alternative was chosen. There is ample room for vigorous governmental implementation of policies when the only limit placed upon such activities is that officials do not act in a manner so unreasonable that no sensible well-intentioned person could accept it." ***Payton***, supra, p. 149.   The question before this Honorable Court is if a well-intentioned person would have disobeyed the Judgment (2007) and the Mandamus (2009) issued by the P.R. Court of Appeals in order to surrender Mr. González to the Immigration and Naturalization Department without further delay. The answer: No. Did the Parole Board members had discretion in order to obey or disregard these judgments? The Answer: No.

5.14   After the approval of the ***Montero Stipulations*** and the reverses suffered by the for the members of the Parole Board in the 2007 and 2009 judgments due to its conduct, its members cannot argue that they were acting according to their wide discretion or in "good faith". On the contrary, the Parole Board members had personal knowledge of the due process and constitutional violations of their acts and therefore their resolutions after 2007 were capricious and arbitrary. The lack of good faith and consequently of immunity from a damage suite is more than justified.

5.15   The practice in the rest of the United States is that after deportation of the parolee, the supervision is meaningless. See ***United States v.***

*Mota-Aguirre*, 186 F. 3d 596 (5to Cir. 1999); *U.S. v. Fongyxmany Phommachanh*, 91 F.3d 1383 (10mo Cir. 1996); *People v. Bolívar*, 643 N.Y.S. 2d 305 (N.Y. App. Div. 1996); *U.S. v. Mercedes-Mercedes*, 851 F.2d 529 (ler Cir. 1988); *Ali Yadyaser v.State*, 430 So. 2d 888 (Ala. Crim. App. 1983); *State v. Camargo*, 537 P.2d 920 (Ariz. 1975); 18 U.S.C.§3583(d); *United States v. Isong Udo Isong*, 111 F.3d 428 (6to Cir. 1997) <u>cert. denied</u> 522 U.S. 883 (1997).

**A.     The good faith requirement**:

5.16   Immunity generally applies to a defendant who acted in good faith. *Jaworsky v. Schmidt,* 648 F. 2d 498 (7th Cir. 1982). In *Wood v. Strickland*, 420 U.S. 308 (1975) the Supreme Court stressed that members of the board of a public school were protected by qualified immunity as long as they had taken decisions within the scope of their discretion in "good faith".   Decisions taken in good faith cannot lead to damages awards.   Otherwise, it would deter people from becoming board members or from making hard decisions after they assumed the office. See Neil P. Cohen, supra, Part 2, at 29-54; 29-55, footnotes 2 and 3.

5.17   The standard for good faith has to be objective:

"… government officials performing discretionary functions generally are shield from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."

*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Mitchell v. Forsyth*, 472 U.S. 511 (1985) as cited in Neil P. Cohen, id.

5.18   Parole Board Officers are also entitled to qualified immunity. They formulate rules and make decisions like school board members.   As an essential part of their functions they are required to use their discretion, a wide range of discretion.   However, their decisions shall be taken in "good faith".   Otherwise, they are not protected from damage awards.   Moreover, "when a good faith defense is available it must be argued forcefully and documented well." See Neil P. Cohen, supra, Part 2, at 29-55.   The defendants in the instant case have failed to comply with the burden of proving their good faith.   *Thompson v. Burke*, 556 F. 2d 231 (3d Cir. 1977) ([I]n 1983 actions the burden is on the defendant official claiming official immunity to come forward and to convince the trier of fact by a preponderance of the evidence that, under the standard of *Wood v. Strickland*, official immunity should attach. On remand the District Court must determine whether the defendants met their burden of establishing (1) that they did not know and reasonably need not to known that depriving Skehan of a pretermination hearing violated due process, and (2) that they acted without malicious intention to deprive him of his constitutional rights or cause him to suffer other injury.)

5.19   "In *Wolfen v. Sanborn*, [666 F. 2d 1005 (6th Cir. 1981)], an Ohio parolee filed a section 1983 action against two Ohio parole officers … The trial jury awarded the parolee $1000, apparently disbelieving the defendants' good faith claims. The court held that the persons asserting the good faith defense have

the burden of proving it." See also **Thompson v. Burke**, 556 F. 2d 231 (3d Cir. 1977) as cited in Neil P. Cohen, supra, Part 2, at 29-55 and footnote 6.

5.20   The refusal of the Parole Board to comply and obey the Court of Appeals' orders and judgments in the instant case are more than telling regarding the lack of good faith. Rather this is a clear case of deliberate indifference, gross negligence or willful and wanton misconduct of the Parole Board members.   It has been well stated that judicial or quasi-judicial immunity does not apply if the challenged act is investigative, administrative or non-judicial in nature (**Forrester v. White**, 484 U.S. 219, 229, 108 S. Ct. 538 (1988)) or was taken in clear absence of jurisdiction. (**Stump v. Sparkman**, 435 U.S. 349, 356-357, 98 S. Ct. 1099 (1978)).   See also **State v. Superior Court In and For County of Maricopa**, 186 Ariz. 294, 921 P.2d 697 (Ct. App. Div. 1 1996)

## VI.   THE QUALIFIED IMMUNITY DOCTRINE:

6.1   A public official performing a discretionary function enjoys qualified immunity in a civil action for damages, provided his or her conduct does not violate **clearly established federal statutory or constitutional rights of which a reasonable person would have known**.   **Harlow v. Fitzgerald**, 457 U.S. 800, 818 (1982).   The pivotal issue when qualified immunity is raised as a defense is whether the defendant official, in this case the parole board members, violated federal law that was clearly established at the time they acted. Id, at 818; **Brosseau v. Haugen**, 543 U.S. 194, 198 (2004).   The immunity is "immunity

from suit rather than a mere defense to liability." **Mitchell v. Forsyth**, 472, U.S. 511, 526 (1985).

6.2    In **Siegert v. Gilley**, 500 U.S. 226 (1991), Plaintiff, a clinical psychologist, brought a **Bivens** action against his supervisor, claiming impairment of future employment prospects due to the sending of a defamatory letter of reference.   The Court of Appeals for the District of Columbia had dismissed on grounds that plaintiff had not overcome respondent's claim of qualified immunity under the "heightened pleading standard."

6.3    The Supreme Court held that the claim failed at an analytically earlier stage.   The Plaintiff did not state a constitutional claim. Under **Paul v. Davis**, 424 U.S. 693 (1976), there was no constitutional protection for one's interest in his reputation, even if facts sufficient to establish malice were pleaded.   Chief Justice Rehnquist set out the "... analytical structure under which a claim of qualified immunity should be addressed." <u>The first inquiry is whether the plaintiff has alleged the violation of a clearly established constitutional right.   This question is a purely legal question.</u>

6.4    In **County of Sacramento, v. Lewis**, 523 U.S. 833 (1998), a majority of the Court reinforced the view that "the better approach to resolving cases in which the defense of qualified immunity is raised to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all." *Id*, at 841 n.5. Justice Souter, writing for the majority explained:

[T]he general sound rule of avoiding determination of constitutional issues does not readily fit the situation presented here; when liability is claimed on the basis of a constitutional violation, even a finding of qualified immunity requires some determination about the state of constitutional law at the time the officer acted. What is more significant is that if the policy of avoidance were always followed in favor of a ruling on qualified immunity whenever there was no clearly settled constitutional rule of primary conduct, standards of official conduct would tend to remain uncertain, to the detriment both of officials and individuals.   An immunity determination, with nothing more, provides no clear standard, constitutional or non-constitutional.   In practical terms, **escape from uncertainty would require the issue to arise in a suit to enjoin future conduct**, in an action against a municipality, or in litigating a suppression motion in a criminal proceeding; in none of these instances would qualified immunity be available to block a determination of law. . .   But these avenues would not necessarily be open, and therefore **the better approach is to determine the right before determining whether it was previously established with clarity**. Emphasis added.

6.5    See also ***Conn v. Gabert***, 526 U.S. 286, 290 (1999) ("[A] court must be first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation.").   In the case at bar the Plaintiff clearly established his right under the eight and fourteenth amendment to be granted due process of law regarding his right to be considered for parole notwithstanding his legal condition as an alien with an immigration detainer. That was so ordered not only in an appeal process of administrative review (2007), but also in a ***Mandamus*** issued by the P.R. Court of Appeals in December 2009, ordering the parole board to comply with the 2007 Judgment. The negative of the parole board members to comply with the Court's order provoked the issuance of a ***habeas corpus*** later on in May 20, 2010. It is to say,

the plaintiff proved that he was illegally deprived of his liberty. ***Otero Fernández v. Alguacil***, 116 D.P.R. 733, 739-740 (1985) as cited in the May 20 2010 Judgment from the P.R. Court of Appeals.

6.6   In ***Wilson v. Layne***, 526 U.S. 603 (1999), the Supreme Court resolved a split among the Circuits as to the availability of qualified immunity for law enforcement officers who invite the media to "ride along" to observe and record the activities of the officers while executing a warrant in a private home. The Court of Appeals for the Fourth Circuit, in a divided en banc opinion, had granted the officers qualified immunity on the ground that, <u>at the time of the challenged conduct, no court had held that the bringing of media into a private residence in conjunction with the execution of a warrant was a violation of the Fourth Amendment</u>.   Finding that the law was not clearly established at the time, the Fourth Circuit did not address the "merits" question of whether such media ride-along, involving entry into a private residence, constituted a violation of the Fourth Amendment, 526 U.S. at 608.   However, in the captioned case the <u>Montero Stipulations</u> together with the Parole Board's Rules clearly established the legal framework in which the case of the Plaintiff should have been analyzed. The Montero Stipulations provides for compensation in case of its violations. Moreover, the actions taken by the parole board members after the judgments entered since 2007 are out of the scope of their discretion as quasi-judicial officers and therefore shall not be protected by the immunity doctrine.

6.7    The Supreme Court affirmed the grant of qualified immunity, **but did so by adopting the analytical approach it had established in *Siegert, County of Sacramento*, and *Conn*.** Before addressing whether the law was clearly established at the time of the alleged violation, the court must first determine whether the plaintiff has alleged the violation of a constitutional right at all.   526 U.S. at 609.   A unanimous Court concluded that such media ride-along violated the Fourth Amendment.   "We hold that it is a violation of the Fourth Amendment for police to bring members of the media or other third parties into a home during the execution of warrant when the presence of the third parties in the home was not in aid of the execution of the warrant."   *Id.* at 614.   *Wilson* not only strongly reinforces the merits-first approach to the qualified immunity analysis, but also clarifies that this approach is not reserved for those cases in which the court determines that the constitutional rights does not exist.

6.8    The Court framed the issue as the objective question of "whether a reasonable officer could have believed that bringing members of the media into a home during the execution of an arrest warrant was lawful, in light of clearly established law and the information the officers possessed."   *Id.* at 615.   In the captioned case the constitutional right violated under the eight and the fourteenth amendment of the U.S. Constitution is a liberty right.   The defendants were fully aware of their obligations towards the plaintiff because of the stipulations required by the District Court in the Morales Feliciano and the Montero case. Moreover,

they had specific findings reached by the court of appeals regarding the violation of constitutional rights of the plaintiff and they disregard the judgments of the court.   Therefore, they could have believed that their actions were performed in violation of clearly established law.

## VII.    THE LAW MUST BE CLEARLY ESTABLISHED:

7.1 The Defendants were notified that their acts or omissions were wrong, and they disregard their obligations, jeopardizing the constitutional rights of the Plaintiff.   The Supreme Court, in **Hope v. Pelzer, 536 U.S. 730 (2002)**, the Circuit Court, while finding the guards nevertheless entitled to qualified immunity, it concluded that Hope could not show, as required by Circuit precedent, that the federal law by which the guards' conduct should be evaluated was established by cases that were "materially similar" to the facts in his own case.

"In its assessment, the Eleventh Circuit erred in requiring that the facts of previous cases and Hope's case be "materially similar." Qualified immunity operates to ensure that before they are subjected to suit, officers are on notice that their conduct is unlawful. Officers sued in a ꞌ1983 civil action have the same fair notice right as do defendants charged under 18 U.S.C. ꞌ 242, which makes it a crime for a state official to act willfully and under color of state law to deprive a person of constitutional rights. This Court's opinion in *United States v. Lanier*, 520 U.S. 259, 137 L. Ed. 2d 432, 117 S. Ct. 1219, … makes clear that officials can be on notice that their conduct violates established law even in novel factual situations. Indeed, the Court expressly rejected a requirement that previous cases be "fundamentally similar." Accordingly, the salient question that the Eleventh Circuit should have asked is whether the state of the law in 1995 gave respondents fair warning that Hope's alleged treatment was unconstitutional. Pp. 7-10.   (Emphasis added).

***

**41**

Despite their participation in this constitutionally impermissible conduct, the respondents may nevertheless be shielded from liability for civil damages if their actions did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982). In assessing whether the Eighth Amendment violation here met the *Harlow* test, the Court of Appeals required that the facts of previous cases be "'materially similar' to Hope's situation." 240 F.3d 975 at 981. **This rigid gloss on the qualified immunity standard, though supported by Circuit precedent, n9 is not consistent with our cases**. (Emphasis added).

7.2    Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." ***Malley v. Briggs***, 475 U.S. 335, 341, 89 L. Ed. 2d 271, 106 S. Ct. 1092 (1986). If "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted," then qualified immunity does not apply. In the case at bar, it was clear for defendants, at least since the first Judgment of the Puerto Rico's Court of Appeals (September 2007), that their actions were negatively affecting the constitutional rights of the Plaintiff. ***Saucier v. Katz***, 533 U.S. 194, 202, 150 L. Ed. 2d 272, 121 S. Ct. 2151 (2001). But if, on the other hand, "officers of reasonable competence could disagree on the issue, immunity should be recognized." ***Malley***, *supra*, at 341.

> "As we have explained, qualified immunity operates "to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Saucier v. Katz*, 533 U.S. at 206. For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, see *Mitchell v. Forsyth*, 472 U.S. 511, 535, 86 L. Ed. 2d 411, 105 S. Ct. 2806, n. 12; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640, 97 L. Ed. 2d 523, 107 S. Ct. 3034

(1987). (Emphasis added).   *Hope, supra*.

\*\*\*

In *Lanier*, the Court of Appeals had held that the indictment did not charge an offense under ' 242 because the constitutional right allegedly violated had not been identified in any earlier case involving a factual situation "'fundamentally similar'" to the one in issue.  *Id.*, at 263 (citing *United States v. Lanier*, 73 F.3d 1380, 1393 (CA6 1996)). <u>The Court of Appeals had assumed that the defendant in a criminal case was entitled to a degree of notice "'substantially higher than the "clearly established" standard used to judge qualified immunity'" in civil cases under ' 1983</u>.  520 U.S. 259 at 263. **We reversed**, explaining that the "fair warning" requirement is identical under ' 242 and the qualified immunity standard. We pointed out that we had "upheld convictions under ' 241 or ' 242 despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Id.*, at 269.   (Emphasis added).

<u>Our opinion in *Lanier* thus makes clear that officials can still be on notice that their conduct violates established law even in novel factual circumstances. Indeed, in *Lanier*, we expressly rejected a requirement that previous cases be "fundamentally similar." Although earlier cases involving "fundamentally similar" facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding. The same is true of cases with "materially similar" facts. Accordingly, pursuant to *Lanier*, the salient question that the Court of Appeals ought to have asked is whether the state of the law in 1995 gave respondents fair warning that their alleged treatment of Hope was unconstitutional. It is to this question that we now turn</u>.

\*\*\*

The con-tours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." <u>*Anderson v. Creighton*</u>, 483 U.S. 635, 640, 97 L. Ed. 2d 523, 107 S. Ct. 3034 (1987). "That is not to say, of course, that conduct can be "clearly established" as unlawful only if a court has already passed on the legality of that behavior under materially similar circumstances. Certain actions so obviously run afoul of the law that an assertion of qualified immunity may be overcome even though court decisions have yet to address "materially similar"

conduct. Or, as the Court puts it, "officials can still [*754] be on notice that their conduct violates established law even in novel factual circumstances."

7.3    Contrary to those who stress that the jurisprudence has imposed a "rigid gloss on the qualified immunity standard", requiring that the facts of a previous case be materially similar to a Plaintiff's circumstances for qualified immunity to be overcome, this suggestion is plainly wrong. See, e.g., **Priester v. Riviera Beach**, 208 F.3d 919, 926 (CA11 2000) (stating that qualified immunity does not apply if an official's conduct "was so far beyond the hazy border between excessive and acceptable force that [the official] had to know he was violating the Constitution even without case law on point" (internal quotation marks omitted)); **Smith v. Mattox**, 127 F.3d 1416, 1419 (CA11 1997) (noting that a Plaintiff can overcome an assertion of qualified immunity by demonstrating "that the official's conduct lies so obviously at the very core of what the [Constitution] prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of caselaw"); **Lassiter v. Alabama A&M Univ**., 28 F.3d 1146, 1150, n. 4 (CA11 1994) ("Occasionally the words of a federal statute or federal constitutional provision will be specific enough to establish the law applicable to particular circumstances clearly and to overcome qualified immunity even in the absence of caselaw"). According to the opinions, orders and stipulations entered in the Morales Feliciano and Montero cases, an ongoing case litigated in this same District Court, it is compelling to conclude that respondents

must have been "aware of the wrongful character of their conduct" because they did not precisely abide by the policy set forth in the AOC regulations and the Parole Board rules.

7.4    To be constitutionally actionable, (a prison officer's) defendant's acts or omissions must result in the denial of "the minimal civilized measures of life's necessities."   *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct., (1970) (1997) (1994).

7.5    To meet this objective requirement plaintiff must show that he is incarcerated under conditions posing a substantial risk of serious harm.   See Helleng v. McKinney, 509 U.S. 25, 113 S.Ct. 2475 (1993).   See Opinion and Order January 2000:

> Inmate-on-inmate assaults, including sexual assaults, extortion, and intimidation tend to be more common and also tell a great deal about the level of safety in a prison system.   Unfortunately, in the AOC system, the failure to deploy staff in a manner that permits supervision of inmates makes it impossible to gather accurate and complete information about the level of inmate-on-inmate assaults, as even Administrator Laboy acknowledges.   (Opinion and Order, p. 15) *Morales Feliciano*, supra.

7.6 To violate the cruel and unusual punishment, a defendant must have a "sufficiently culpable state of mind."   Parole Board members and AOC Administrators are fully aware of the inherent dangers related to imprisonment in the Puerto Rico AOC system. The defendants reckless disregard to the P.R. Court of Appeals judgments constitute "deliberate indifference" to plaintiff's freedom and safety.   *Farmer*, supra 511 US at 834, 114 S.Ct. at 1997.

7.7   A defendant may be found liable under the Eight Amendment for denying an inmate humane conditions of confinement when Defendant knows of and disregards an excessive risk to inmate health and safety, when the Defendant is both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and Defendant must draw the inference.   *Farmer, supra*, at 837, 114 S.Ct.   At 1975.

7.8   Plaintiff need not show that defendants acted or failed to act believing that a harm actually would befall an inmate, it is enough that they acted or failed to act despite their knowledge of a substantial risk of serious harm.   *Farmer, supra,* at 842, 114 S.Ct. At 1981.

7.9   **Moreover, the inquiry is whether an administrator has knowledge about a substantial risk of serious harm to a particular class of person, not whether he knows who the particular victim might be**.   *Taylor v. Michigan Dept. Of Corrections*, 69 F.3d 76, 81 (6th Cir. 1995).   (In this case Dominican Republic citizens that have been discriminated due to the lack of a reciprocal agreement with the Government of the Dominican Republic which allows the Government of the Commonwealth of Puerto Rico to supervise parolees once the inmate is released and deported to his homeland, the Dominican Republic).

7.10   An injury or risk thereof may be so obvious that a fact finder could conclude that the administrator did know of it because she could not have failed to

know of it **Brice v. Norginea, Beacl Correctional Center**, 58 F.3d. 101, 105 (4th Cir.1995), where a risk is "longstanding, pervasive, well documented, or expressly noted[14] in the past, and the circumstances suggest that the defendant officials being sued had been exposed to information concerning the risk and thus, must have known" about it, then such evidence can be sufficient to conclude actual knowledge.   **Farmer**, supra, at 842-843, 114 S.Ct. At 1981-1982.

7.11   The risk of due process violations inherent in the Administration of Correction System and the Parole Board violations to its own Rules are pervasive, longstanding and well documented.   These problems have been described in numerous reports and opinions.   See, _Morales Feliciano_ and _Montero_ cases.

7.12   The Defendants failed to provide minimal due process guaranties to the Plaintiff, as well as to the inmate population who are citizens of the Dominican Republic.   The Defendants also disobeyed the Judgments of the Puerto Rico's Court of Appeals since 2007, Judgments that clearly established the rights of the Plaintiff beyond the specific provisions of the Montero Stipulations.   See Due Process of Law, supra.

## VIII.   EIGHT AMENDMENT CAUSE OF ACTION:

8.1   In its prohibition of "cruel and unusual punishments" the Eighth Amendment imposes duties on prison officials who must provide humane conditions of confinement, must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must **"take reasonable measures to

guarantee the safety of the inmates." ***Hudson v. Palmer***, 468 U.S. 517, 526-27, 104 S.Ct. 3194, 3200 (1984).   See also, ***Helling v. McKinney***, 509 U.S. 25, 31-32, 113 S.Ct. 2475, 2480 (1993); ***Washington v. Harper***, 494 U.S. 210, 225, 110 S.Ct. 1028, 1038-1039 (1990).

8.2   A prison officer violates the Eighth Amendment when two requirements are met.   First, the deprivation alleged must be, objectively, "sufficiently serious."   ***Farmer v. Brennan***, 511 U.S., 825, 834, 114 S. Ct. 1970, 1977 (1994) (hereinafter "***Farmer***").   Second, the officer must have been deliberately indifferent to the inmate's health and safety. ***Farmer***, 511 U.S., at 834, 114 S. Ct., at 1977 (inmate on inmate attack).   The Supreme Court in ***Farmer***, pointed out that "deliberate indifference" entails something more than mere negligence, but it is satisfied by something less than acts or omissions for the purpose of causing harm or with the knowledge that harm will result. Accordingly, the Court held that a Defendant may be found liable under the Eighth Amendment when the defendant knows of and disregards an excessive risk to inmate health and safety or when the defendant is both aware of facts from which an inference could be drawn that a substantial risk of serious harms or a constitutional violation exists. *Farmer*, 511 U.S., at 837, 114 S. Ct., at 1979.

8.3   In order to satisfy the subjective standard explained above, it is enough to show that the Defendant acted or failed to act despite his or her actual or constructive knowledge of a substantial risk of serious harm or constitutional

violation, in this case of due process and equal protection before the law. *Farmer*, 511 U.S., at 842, 114 S. Ct., at 1981.   "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, **including inference from circumstantial evidence,..., and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious**.    *Id. Emphasis added*.

8.4    Pursuant to this standard, to prove a supervisor's liability, plaintiffs must show:   (1) a substantial risk of harm [or constitutional violation], (2) the supervisor's actual or constructive knowledge of that risk [or constitutional violation], and (3) his failure to take easily available measures to address the risk [or avoid the constitutional violations].    ***Camilo-Robles v. Hoyos***, 151 F. 3d 1, 7 (1st Cir. 1998).  **The question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a substantial risk of serious harm.**   Moreover, the inquiry is whether an administrator has knowledge about the substantial risk of serious harm **to a particular class of persons, not whether he knows who the particular victim might be.** ***Taylor v. Michigan Dept. of Corrections***, 69 F. 3d 76, 81 (6th Cir. 1995).   In the case at bar the Administrator of the AOC had notification and personal knowledge of the violation of Plaintiff's rights and he did nothing in order to correct the unconstitutional conditions of confinement of Mr. Gonzalez.

8.5    Reasonable protection from the constant threat of violence, terror, physical aggression, and sexual assaults is required by the Constitution. *Morales Feliciano v. Romero Barceló*, 672 F. Supp. 591, at 619 (D.P.R. 1986) (citations omitted).

8.6    When a correctional officer or prison official intentionally exposes a prisoner to a known risk of violence at the hands of another prisoner, he breaches the duty imposed upon him and deprives the victim of the security to which he is constitutionally entitled.    *Goka v. Bobbitt*, 862 F. 2d 646, 649-50 (7th Cir. 1988).

8.7    The evidence in this case has proved that Benjamín González had certain protected rights under the Constitution, the laws and the AOC and Parole Board Regulations in Puerto Rico.

8.8    The Defendants in supervisory positions knew too well of the deficiencies that existed in order to comply with the due process guaranties and the Montero Stipulations.   The AOC and the Parole Board failed to take the necessary steps to cure such breaches. **Moreover, the Administration of Corrections and its Administrator, Miguel Pereira and Carlos Molina, as well as the members of the Parole Board did not follow the Judgments of the Puerto Rico's Court of Appeals in violation of the liberty rights of the Plaintiff.**

8.9    The deliberately indifferent failure to comply with the Puerto Rico's Court of Appeals Judgments denying the release from prison to the plaintiff

violates the constitution.   *Free v. Granger*, 887 F. 2d 1552, 1554 (11th Cir. 1989) ("Proof of staffing or procedural deficiencies may give rise to a finding of deliberate indifference");   *López v. LeMaster*, 172 F. 2d 756,   763 (10th Cir. 1999) (Failure to provide adequate staffing and monitoring of inmates could amount to deliberate indifference).

## IX.   ONE YEAR STATUTE OF LIMITATIONS AFTER *HABEAS CORPUS*:

9.1   "Under 42 U.S.C. sec. 1983, an aggrieved individual may sue persons who, acting under color of state law, abridge rights, immunities, or privileges created by the constitution or laws of the United States." *Muñiz-Cabrero v. Ruiz*, 23 F. 3d 607, 610 (1st Cir. 1999).   It is well settled that section 1983 do not have a specific statute of limitations, thus "the personal injury statute of limitations of the forum state governs in civil rights actions, Id. (Citations omitted), the date of accrual, i.e., the date on which the limitations clock begins to tick, is determined by federal law." Id. Citations omitted.   In Puerto Rico, the applicable statute, P.R. Laws Ann. Tit. 31 Sec. 5298, prescribes a one year limitation period beginning on the date of accrual.   "Under federal law, the limitations period in a sec. 1983 case ordinarily starts when the plaintiff knows, or has reasons to know, of the harm on which the actions are based." Id. Citations omitted.

9.2   In prison cases, in a Section 1983 claim for allegedly unconstitutional conviction or imprisonment the Supreme Court stated: "We hold that, in order to

recover for damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid a 1983 plaintiff must prove that the conviction or sentence has been reversed [See *Habeas Corpus* Judgment of the Court of Appeals, **Exhibit 5** on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of *habeas corpus*."   **Heck v. Humphrey**, 512 U.S. 477, 486-87 (1994). The Court held that a section 1983 "cause of action for damages attributable to an unconstitutional conviction or sentence does not accrue until the conviction or sentence has been invalidated." **Heck**, supra, at 489-90.

9.3    "For the forgoing reasons, we hold that for purposes of determining the appropriate accrual rule both the Fourth and the Fourteenth claims more closely resemble the common law tort of malicious prosecution.   Consequently appellants section 1983 claims did not accrue until their respective criminal prosecutions ended in acquittals."   **Calero-Colón v. Betancourt- Lebrón**, 68 F. 3d 1, 15 (1st Cir. 1995)-citing **Heck**, 114 S. Ct. at 2371; and **Guzmán Rivera v. Rivera-Cruz**, 29 F.3d 3, 5 (1st Cir. 1994).

9.4    On May 20, 2010 Benjamín González Mercedes was ordered to be release from prison pursuant to a writ of **habeas corpus** based in the previous judgments of the Court of Appeals dated September 28, 2007 (Administrative Review) and December 14, 2009 (**Mandamus**).   He was finally released from

prison and surrender to the immigration authorities in June 1, 2010.   Therefore, the Defendants' statute of limitations argument is without merits.

**WHEREFORE,** the plaintiff, Benjamín González Mercedes, respectfully requests from this Honorable Court to DENY the defendants' Motion to Dismiss in its entirety.

**RESPECTFULLY SUBMITTED**.

In San Juan, Puerto Rico, this 22nd day of November 2011.

**I HEREBY CERTIFY** that on this same date I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the attorneys for the defendants.

*s/Fermín L. Arraiza Navas, Esq.*
USDC-PR No. 215705
Edificio Alma Mater
867 Calle Domingo Cabrera
Santa Rita, SJ, PR 00925-2412
Tel. (787) 758-0315
Fax (787) 758-0315
E-mail: fermin_ns@hotmail.com


*s/Federico Lora López, Esq.*       *s/José J. Nazario de la Rosa, Esq.*
USDC-PR 201202                       USDC-PR214401
P.O. Box 194266                      Edificio Alma Mater
San Juan, PR 00919-4266             867 Calle Domingo Cabrera
                                     Santa Rita, SJ, PR 00925-2412
Tel. (787) 758-4995                  Tel. (787) 758-0315
Fax (787) 751-1578                   Fax (787) 758-0315
E-mail: rosslora@prtc.net            E-mail: nazysant@caribe.net